## Case No. 528.

### The ARIES.

[2 Spr. 198.] [1]

District Court, D. Massachusetts.   May, 1863.

PRIZE—VIOLATION OF BLOCKADE—ACT OF MASTER —OWNERS OF VESSEL AND CARGO.

1. In case of breach of blockade. the owners of the vessel, in a prize court, are conclusively bound, in all cases, by the act of the master.

2. It is also a general rule that the owners of the cargo are bound in like manner; and the few cases in which persons interested in the cargo are permitted to show that the act of the master in violating blockade was against their wish, are carefully guarded, and are

---

[1] [Reported by Hon. Richard H. Dana, Jr., and here reprinted by permission.]

chiefly such as present a kind of physical impossibility of their knowledge or desire.

3. Examination of facts to show a hostile destination and ownership of cargo.

In admiralty.

R. H. Dana, Jr., U. S. Atty., for the United. States and captors.

C. G. Thomas, for claimants of vessel.

H. H. Coolidge, for claimants of cargo.

SPRAGUE, District Judge. The steamer Aries was built little more than a year ago, in Sunderland, England, and owned, as the papers show, by a person with a foreign. name, and called by some of the witnesses. a Spaniard, F. P. Obicini. She sailed from Sunderland directly to Charleston, S. C., running the blockade of that port, with a cargo which was sold there by auction. None of the papers found on board show what was her ostensible destination for that voyage. We learn the fact from the admissions of the master and mate, on the preparatory examination. From Charleston she sailed with a cargo of cotton, again breaking blockade, to Porto Rico, and thence to St. Thomas. At St. Thomas she took in a cargo, and sailed to Gibara, in Cuba, near Havana, where she took in more cargo, and sailed thence for Charleston, and was captured at Bull's bay, near Charleston, by the United States steamer Stetton, Captain Devens, on the 28th March last, in the act of attempting to break the blockade. The master, mate, and crew admit, on their examination, that the actual destination was Charleston, while the ostensible destination, on all the ship's papers, was New York. Under these circumstances, the condemnation of the vessel is inevitable. The master, who has been here and returned to England, puts in no claim for the vessel. The only claim is by the British consul, rather a formal and official claim, in behalf of vessel and cargo, for British owners. As the blockade has long been notorious, and the vessel has been in and out of Charleston in violation of it, the owners of the ship cannot be heard to deny that the master was their agent in his acts. Indeed, the rule of prize courts seems to be that, in all cases of breach of blockade, the owners of the vessel are concluded by the act of the master. In this case, there is satisfactory evidence that the owners knew of the blockade, and must have known and assented to this series of acts in violation of it.

A claim is put in for the cargo by Messrs. Riera. Thibaut, & Co.. of New York. as agents: for Messrs. I. Munne & Co., of Gibara, Cuba. Their affidavit states only that the cargo was consigned to them, at New York, by I. Munne & Co., who sent them three bills of lading of the cargo, and a letter of advice. On learning of the capture, and of the arrival of the Aries in Boston, they wrote to I. Munne & Co., and received a reply; but they do not annex the reply to their affidavit, or a copy of it, and only say that it promised

further information. It is evident that Messrs. Riera, Thibaut, & Co., knew nothing of this consignment beyond the fact that there was an ostensible consignment to them at New York. The preparatory evidence shows that two Spaniards, by the names of Salcedo and Malgar, sailed in this steamer, as passengers, from Sunderland to Charleston, and thence throughout the voyage, until her capture. The mate says he understood they owned the outward cargo, and that they acted as owners at Charleston. At St. Thomas, two other Spaniards, by the names of Pucho and Estoval, joined her as passengers, and were in her when captured. Estoval was examined, and states, without attempt at concealment, that the cargo was owned by these four passengers, he having given the others $1000 for an interest in it, the extent of which he does not state; that there were no bills of lading or consignees of the cargo; and that it was destined for Charleston, to be sold there by the owners, who accompanied it. He makes no claim to it in this court, apparently considering it as a hopeless case, and says, in his examination, that he lost his adventure by the capture. The three other passengers left the vessel, and have made no attempt to claim their property. The mate also testifies that this cargo belonged to the passengers. The engineer also testifies that it was reported on board that the passengers owned the cargo or a part of it. The testimony of the master, William Richards, is disingenuous. He at first states that the steamer was bound, "by her papers," to New York, and says he does not know who owned the cargo, and refers to the bills of lading as showing who were consignees, and says he thinks Roman & Poa, of Porto Rico, were the shippers, to whom he gave bills of lading; but, at last, admits that she was bound to a Confederate port. The officers, and such of the crew as were examined, all admit their knowledge of her actual destination. Against this testimony, we have only the documents found on board. These, of course, would not be expected to disclose a blockaded port as the port of destination, for that would betray her to any cruisers who might board her. She would have an apparent lawful destination to exhibit to cruisers so long as it would serve her, and until it was necessary to keep off for her destined port, when the ostensible destination would no longer avail her. Her ostensible destination was from Havana to New York, which would account for her position off the southern coast, at any point not too near in shore. But the cargo was of a character it would be absurd to suppose could be sent from the West Indies to New York. It consisted chiefly of the produce and manufactures of the New England and the middle states, which are exported thence to the West Indies, and other articles paying high duties in the West Indies. It would require great credulity to believe that a cargo of cotton and flannel clothing, flour, breadstuffs, boots and shoes, butter, cheese, tea, nails and spikes, pig lead, and cordage was destined on any mercantile enterprise from St. Thomas and Cuba to New York, rather than to the rebel states.

There are found on board three bills of lading, all dated at Gibara, in the name of J. Munne & Co. as shippers, with Riera & Thibaut, of New York, as consignees, and a letter accompanying them. This letter is from J. Munne & Co. to Riera & Thibaut, and states that this cargo, part shipped at St. Thomas and part at Gibara, chiefly belonging to the writers, but a part to a passenger, is all consigned to them. It requests them not to insure, and says they will advise them hereafter what to do with the proceeds. The custom house documents all contain the same statements as to the consignments of the cargo, and destination of the vessel. If Messrs. Munne & Co. were the real owners of this cargo, I could not permit them to show that they did not know of the intent of the master to break the blockade. The general rule is, that the owner of the cargo is concluded, in respect of breach of blockade, by the act of the master; and the cases in which he is allowed to show that the act of the master was without his knowledge and against his wish, are few and carefully guarded; one being where it was physically impossible that it could have been otherwise, as where no war or blockade existed, or was impending when the vessel sailed, and there had been no chance to communicate since. But, in this case, it is impossible to suppose ignorance in Munne & Co. The blockade of Charleston had long been notorious, and the four passengers, and the master, officers, and crew, all knew that this vessel had come from Charleston, and was bound directly there again; and the letter of Munne & Co. shows that they had relations with one of the passengers respecting part of the cargo, and they of course had dealings with the master, who signed the bills of lading made out for them from printed blanks furnished by them. It seems also that, with full knowledge of the capture and prize proceedings here, they have done nothing which their nominal agents think it necessary to bring before this court. If an owner of a cargo could save his property in a clear case of breach of a notorious blockade, by showing that he did not, in fact, know of the intention of the master of the vessel to attempt a breach of the blockade, such proof could always be given. He would be studiously silent and uninformed on the subject, and have a full supply of documents to show a lawful destination; and probably nominal owners would also be resorted to, who might in fact know nothing, and care nothing, about the cargo and its destination. The rule of the prize courts is doubtless a wise and necessary one on this head. In

the present case, however, the evidence discloses actual ownership in the four passengers, without bills of lading or consignment, and a formal and fraudulent title and papers in Munne & Co., with a false destination and consignment, to cover the transaction as long as the cover would avail it. And even if Munne & Co. were the owners, they would be concluded by the clear force of the evidence in the case, without the necessity of resorting to the presumption of law laid down in the books. Decree of condemnation of vessel and cargo.

[NOTE. For a subsequent hearing in this case concerning the distribution of the proceeds of the condemnation sale, see The Aries, Case No. 529.]